Gary Ehrlich, ERLICH, representing Appalachia Plaintiff CenterPoint Properties Trust. Each side has 15 minutes. We don't look at our watches, so if you have something, as long as you're being interesting, we'll continue to hear you. I can assure you that all three of us have read the briefs and we're familiar with the pertinent portions of the record. So we'd appreciate it if you cut right to the chase, right to your strongest points. So anytime you're ready. Thank you, Your Honors. Well, as you know, this case comes before the court on an order appointing a receiver in a mortgage foreclosure case. The principal issue in this case is the application of Section 15-1701B2 of the Illinois Mortgage Foreclosure Act and what constitutes good cause under that section to allow a mortgagor to remain in possession of a piece of property during a mortgage foreclosure case. The facts of this case, while they're not complicated, are different from all of the other cases that have been cited to the court, both the two main Illinois cases as well as several federal cases that have interpreted the statute. The critical facts here are the main fact being that it's a $37 million loan, which is secured by a mortgage on what is essentially a vacant piece of property. The buildings that are on the property have no meaningful rent, there's nothing meaningful to manage, and the value of the property, and this was noted by Judge Delort, is in its developmental ability. It's not in that it has buildings on it that generate rent either to sustain the mortgage or for the owner to make a profit. We contend here that the value of the property is maintained and maximized by having the mortgagor, the owner, to remain in possession and that allowing a receiver to be in possession has the likelihood of actually devaluing the property. Well, when you say devalue the property, property is only worth what somebody will pay for it, right? Correct. And so how's that going? I mean, since 2016 collapsed, I wouldn't be as surprised to see an enclosed McCormick place in a couple of years. What is the hope that All Prairie can have of being able to recoup money and then pay off the loan? The hope is in all of the efforts, money, and time that's been invested in the development of this property. There have been architectural plans drawn, there's been schematics and pictures drawn of an entertainment district, a hotel district, a residential district, most of which would be patronized by conventioneers at McCormick Place. And, you know, recently maybe that suggests to be a problem, but I think McCormick Place is not going away. That business will remain there. And there is nothing in that area quite like what is being proposed here by way of hotels, restaurants, and the like. So the value is in the fact that it someday will be developed. But when you say someday, but the hope is All Prairie would want to sell it, right? I mean, develop it piece by piece or whatever, but develop it. There's no hope in the foreseeable. When I say foreseeable, five years, is somebody going to come in and say, I'd love to buy 22nd Street, All Prairie? You know, they've had the loan out now for a couple of years. This was a one-year loan. It was a one-year loan, but it's been, right? It's been about another year. Correct. So it's about two years. I mean, people aren't beating down the door to buy the property. So why would your person be in a better position to sell the property than the bank? It's not that they're in a better position to sell it, but it's whether we are in a better position to go forward with proposing development plans to developers, to hotels, to restaurants as the receiver's job, not only outlined by the statute, but as evidenced by what the receiver has done so far, is to collect the $10,000 a month or $15,000 a month. There's really nothing that needs to be done by a receiver, but their presence. Well, other than closing it off, which I suggest is very important, in terms of not repairing the roofs necessarily, because you say the buildings will come down, but you don't have to close these things off. You must secure these places or, frankly, the homeless who hang out in these places will get hurt and sue you. And the city has ordinances on it. In that regard, we did have a police officer, and the interesting thing is that that's what the receiver has done, has continued on with the police officer doing the security. They boarded up some windows. They inspected the property and said, oh, there's a possibility of mold. There's a possibility of asbestos. And this needs to be taken care of when the buildings are demolished. Well, that's not going to happen any time soon. That's going to happen when it is developed. So that's not anything that's... Excuse me, counsel, but you're speaking of these plans, and they sound hopeful, and they sound like they could be successful in the future, but how does that equal good cause? It equals good cause because what you have here, the term good cause, and I think Judge Delort addressed this, it must mean something. In all of the cases to date have found there is good cause, but none of the cases to date have involved a vacant piece of property, and none of the cases to date has there been any real showing by way of any evidence, affidavits or the like, that there is reason to leave the mortgagor in possession. Here we have the affidavits to show that there has been some potential investors who have said, no thanks, not if you're not in possession. That's the affidavit of Judy Thornbur. The affidavit of Luke Sauer has shown that he can't get potential tenants interested in the project with the presence of a receiver. Now, granted, there's also the foreclosure case, but if it's only the foreclosure case, that's just about money. With the receiver, it's also about control, and without control, that ties the owner's hands from getting the access to the property, and it's just another threat that causes potential investors, tenants and the like to say, we're not interested in this. Now, can I say that without the receiver, it's going to happen? No, there's a lot of other things that have to happen, but the other important feature, and this is also included in the affidavit and offer of proof of Pamela Gleishman, is that she has spent a lot of time and effort in having contacts with the city of Chicago, in terms of she's got a TIF district involved, she's got it rezoned, and she knows what the city of Chicago wants and will accept. The receiver isn't doing any of that stuff. So to the extent that there is some value in this property going forward, which is what Judge Delort recognized when he said, this is at least a case that's in the ballpark of one where there's good cause. It's interesting. There's no question, but the bottom line for any mortgage lender, the principle behind mortgage lending is that they are protected at the end of the day by the right to possess and sale of the real estate if the mortgage is not paid, and there's no hope of this mortgage being paid for years, unless somebody comes in out of the blue and says, you know, I'd like to buy this thing for $37 million. Well, you know, the record doesn't reflect all of the things that are going on. We don't have anything to say this afternoon we're closing on a loan, but the idea of a development is not that. The owners are still pursuing, obviously they want to get money to pay off the loan. Right. They want to sell it, right? Your people want to sell it. The bank would love to sell it. They want to develop it, and the way they get money is to propose a development. All of the things that they have put together by way of drawings and sketches to show what this property can be and how it can enhance not only the value of the neighborhood, but the value of and the attractability of McCormick Place, because now there would be more hotels. Again, none of it's signed, sealed, and delivered, but the only one who's working on that at the moment are the owners of that property. The receiver isn't doing it. The receiver isn't charged to do it. The receiver isn't expected to do it. What's the likelihood of your plan going through? I'm sorry? What's the likelihood of your plan going through? I think the likelihood of something happening has improved over the last six months with the finance markets becoming a little bit better. Ms. Gleisman continues to talk to other investors, other partners in this deal. It's what she does every day, trying to put this project together, trying to get the money to pay off Centerpoint. So everything is built in a planning stage. Yes, it is in the planning stage. There's no refinancing is about to close, as I said. As far as I know, there's no hotels that have signed the deal yet. But with the added impediment of a receivership, all of that becomes less likely. You mentioned that. Going back to what Justice Cuomo was saying, you do concede in your reply brief that the statutory requirements are met here for Centerpoint to take over, other than the argument is, as Justice Cuomo is pointing out, about good cause. So how is it then, though, how do we write it for not just this property, but all properties, that mortgage lenders, rather than mortgage holders, can show good cause by saying they are more competent in trying to sell a piece of property than the bank? That's going to be hard to do. What we've tried to do in our briefs is address the question that Judge DeLorde had. There's no guidance here as to what exactly good cause is. And we've suggested three ways the court can look at that in the future, one being which party was more efficient, which party is more efficient to be in possession of the property. The question is not who can collect the rents the best. I mean, I could do that in this property. So that's not the issue here. The issue then here is, and the value of the property is not going to be enhanced in any way by the presence of the receiver here, because the value of the property is in development. So what difference does it make whether the receiver is in possession or the owner? Well, here the owner wasn't charging the fees to do whatever services needed to be done. That was being done by Ms. Gleichman and her management companies, which Senator Point has objected to, but we can address that if that's of any consequence. So one way that the court can look at whether or not good cause has been shown is to take a look at who can more efficiently possess and manage what needs to be managed. Well, there's not much that needs to be managed except the development of this property. Let's talk about the potential development. The only party that's interested in potentially developing this property right now is Old Prairie. Senator Point, on the papers, appears to be a lender. Now, there's more to it than that, but the issue here is good cause. The way you phrased it was, what difference does it make who possesses it? Clearly, your position, it does make a difference. I don't know that I buy that in the sense of, again, looking at this piece of property. I don't know that the lenders could be much more motivated to do what they have to do to try and recoup some money on this, which, again, the statutory is not just a presumption, it's the rule. So now we have to overcome this rule, and I don't know that Old Prairie could be any more motivated there than they are to come up with the money. So why should we find, how is it that Old Prairie is so much harmed by their hope, their plans harmed by the fact that there's a receivership? Just the affidavits of the employees to say, well, people are less likely to buy a piece of property that's foreclosed for $37 million if it's in receivership than they would be to invest in a property with $37 million foreclosure that's not in receivership. I think another way to look at it and another suggestion that we have made as to when you can show good cause to leave the owner, the mortgage owner, in possession is a balancing of the harms here. And if you look at Centerpoint, what harm is there to Centerpoint if Old Prairie stays in possession? The repayment to Centerpoint isn't going to be affected if Old Prairie stays in possession because it's not like there's a 100-story apartment building that's generating rents that we might abandon and lose that. The value, again, is in the property. It's not in what's on the property. And the property is going to be there. And what is the harm to Old Prairie if they're not in possession? The harm is this idea of will they lose the development? Will it go forward? But what that also does, Your Honor, is to leave Old Prairie in possession and continue on with even the possibility of development is a benefit to Centerpoint as well because to the extent that Old Prairie is promoting this concept of hotels, restaurants, entertainment, and residences, and they get it done, that enhances Centerpoint's ability to get paid. And in the meantime, if that's not getting done, then the value of the property decreases. And when they go to sell it at auction, who's interested in buying it? Maybe nobody. So the people who are interested in buying it, and the best way that Centerpoint can get its money is to give Old Prairie every opportunity to promote the development. And leaving the receiver in place impairs that because we don't have complete control of the property. We don't have all the access we'd like to have. We'd like to have free access, free ability to say we control the property. We just need the money to pay off Centerpoint, and then we can go. In the meantime, we have another hurdle to crawl over. But nothing is preventing you from doing that. Receivership doesn't say you're not allowed on the property, does it? If Old Prairie were to call the Centerpoint security officer, the same guy, say, you know, we've got some potential investors coming by today. Tell the receiver, hey, we're coming by with some guys from some other planet. They don't know any better. I'm sure they'd be glad to have you. Do you think they wouldn't? I suppose they would like to have that happen. But why throw that extra roadblock? The foreclosure is bad enough, but why impede it when there's really nothing there for the receiver to do that hasn't been done at least as efficiently as Old Prairie has done up to date and allow Old Prairie to have that access to the property, that control of the property. And for whatever value it has, do it for free. Well, the reason to do it is the statute, which we have to follow, gives them the right. So if we look at this as this huge mortgage fiasco of everywhere, this is commercial. But in the other side, so you look at a residential and an understand they're completely different. The presumptions cut exactly the opposite way. But nobody would suggest, at least I'm not seeing it suggested, that banks should not be allowed to foreclose on people's homes. Once they obey all the rules, delay the thing for nine months, a year, however long it takes, eventually get the poor people out, the bank gets to do what they want. And there's an argument made in Congress, of course, that, well, gosh, aren't the banks better off just getting some money from the current residents since nobody's going to buy this foreclosed home, and that the banks often don't take that tax. Well, it's their home. It's the bank's home, not the people who didn't pay the bank have lost their rights to the home. It's the bank's home. They get to do that. So it may make more sense, economic sense, I'll let the people stay there, cut down their rates. The banks don't have to do that. In the opposite, I mean, the bank's in a much stronger position in commercial real estate since the statute directs that this is how we're supposed to do it. Unlike residential where we can make the bank suck it up for a year, year and a half, however long it takes, that's the opposite in commercial real estate. So it's the statute. It is the opposite. But the statute involving commercial real estate allows for if good cause is shown. And that was put in the statute for some reason. No court has yet found that reason. And we have come forward with, I think, reasons supported not just by argument but by affidavits. And the affidavits suggest and show that what you have here is the potential of harm to both parties by leaving the receiver in there, a receiver that really has not much to do. And if you look at the statute and what the receiver should be doing, then it really makes sense in a setting like this. So what we have tried to show the court, this is a case where some guidelines can be set forth as to what does constitute good cause. And we know arguments rather than evidence don't cut it. We've seen that in the cases. And we appreciate that. We also understand that it's our burden. It's not Centerpoint's burden to show that they are entitled to it. So it doesn't make sense. It doesn't ever make sense. It's the law. You know, the law is always right. You know, but if you get into a situation. And plus, you've got a piece of property here that has nothing on it. Now, if you take and compare it to an apartment building or a commercial building, businesses, whatever, a lender is going to get possession of that building to make sure they get the rent, they make sure the building is maintained, where the mortgagor doesn't have the same motivation or there's certainly a risk of they're going to lose it so maybe they'll walk away from it. It makes sense there. And that's what the statute talks about is collection of rents, maintenance, hiring security guards, making sure the building operates, the property is protected, the value of the property is protected for what it is. The value of this property for what it is is essentially vacant property. So what we have here is an opportunity to show that there are some circumstances that where good cause makes some sense. We have come forward with some evidence, not just pie in the sky. Yes, it's plans, it's proposals, but it's stuff that's happening. It's continued to happen. There's a lot been done. And certainly the mortgage foreclosure case is going to proceed with or without a receiver. And at the end of the day, if we don't have the money, we know what's going to happen. But why not give the mortgagor every opportunity and every advantage to try to maximize the value of their property in the interim and maximize every opportunity that the owner has to achieve refinancing to take out the mortgagee. That's the point here. We've got to have some definition of good cause. Excuse me, counsel. Yes. What you say is true. We need a definition of good cause. But the cases that we do have, how is your fact situation different? I mean, home life and travelers and melanin, they believe that. I don't see that the facts that you're relying on in your situation of your client is different, that substantially different from those presented in those cases. The facts, in our view, are significantly different. Number one, all the other cases involve properties with buildings on them that needed to be managed. This is the only case where the property is essentially vacant. That's a significant difference because there is a role for a receiver that's consistent with the requirements of the statute in those other cases. The requirements of the statute of what a receiver is to do is not applicable in this situation. Secondly, in none of those cases was there any evidence. There was argument. There weren't any affidavits. Some of the cases even say, well, you might have a point here, but you haven't come forward with any affidavits to prove it. We have done that. And thirdly, I think that we have shown, at a minimum, the possibility. Excuse me. Take me back. So you're saying we're not saying that our situation or claims that we present in our affidavits are different. We're just saying we have affidavits to prove it, and they did. I think our affidavits go well beyond any of the arguments made in any of those cases, even if there were affidavits to support them. Some of them simply said we are better suited to manage without any real explanation as to why. Some of the arguments in those cases were essentially an attempt to burden shift, which the court said, well, you're not going to do that, and we understand that. And some of them basically said, well, the tie goes to the runner, in this case the receiver. And we have here, I think, better than a tie, and we also have the argument that there's really no reason to have a receiver for this type of property and this property in particular. We'll save a few minutes for reply, and we'll hear from you this time. Thank you, Your Honor. Mr. Ehrlich. Thank you. If the borrower was about to sell the property, it had a contract in place, it needed a month or two to sell, that might be good cause, not some nebulous plans that may take years to materialize. If they had a commitment for refinancing and it was a couple months away, and this would be back in May of 2009 when the receiver was appointed, that might be good cause. Instead, what we have here is an argument that they need years to develop the property. In order to defend the mortgage foreclosure, the borrower filed a counterclaim claiming rescission and breach of the Consumer Fraud Act by an opinion dated September 23, 2009. Judge DeLorde dismissed the counterclaim in a Rule 216 decision, which is attached to the brief. An amended counterclaim was filed, and just recently on Thursday, Judge DeLorde entered an order, it's a four-page opinion, I believe, and I can supply it to Your Honors if you want. I think it's dated January 14th, which is last Thursday. He dismissed, again, on a 615 motion, he again dismissed an amended counterclaim. We've had a motion for summary judgment for an order of foreclosure and sale on file since October. I expect that shortly the property is going to get sold, and we've had a receiver since May of 2009. I don't see how it makes any sense at this point to pull the receiver and put it back into possession of the borrower for what's going to be a very short period of time. So it does impact on that, the fact that there's going to be a foreclosure and there's going to be a sale of the property in a short period of time. We're also bringing up, it's not just fairness when I did, I'm not that type of guy. I'm more concerned, that's not going on in front of us, that's not part of this record. We kind of made the point in their reply brief that a lot of what we're looking at, a lot of what's brought up in your brief, really are bad things that have occurred to the property since the receiver was appointed. And they'll be the failure to pay taxes, the failure to pay for the roof, et cetera. I have no problem considering those because it makes sense. It's really a question of trust is what it comes down to. I mean, it really comes down to a question of trust. Why should the lender trust the borrower to keep the insurance in place when there's a loan in default and they apparently don't have sufficient funds? Yes, they're using the same security company that the borrower used, but why should the lender trust the borrower to make sure that the security company is paid every month and that the security company is doing its job? Well, you outlined for me, and you probably already have a little bit, what harm would it be to the mortgagee if the mortgagee or rent remains in possession while the foreclosure is pending? Well, exactly that, that the insurance might not get paid, that the security might not be in place. Yes, there is rent that's collected. Right now, I think it's $10,000 a month or $15,000 a month. Why should the borrower get that $10,000 or $15,000 a month? Why should the lender have to trust the borrower to collect the right amount of rent? Why should the lender have to trust the borrower to make sure that the building doesn't fall, one of the buildings doesn't fall down into the street? All you have to do is read the receiver's report, and that's not our burden really. When you look at the cases, it's not our burden to show that there's been mismanagement, but in fact, if you read the receiver's report, there has been mismanagement. So even if there wasn't any mismanagement, why should the lender have to trust the borrower to make sure that all of this stuff is taking place, that the insurance is paid, that the taxes are paid, that it's properly secured, when the borrower has defaulted on a $37 million loan? This was a loan that had to be paid in total after a year, right? So it's not $3 million a month. It was a short-term, one-year loan. We weren't in this for the long haul. This wasn't a 25- or 30-year mortgage in which payments were supposed to be made every month. They have long-term development plans. We weren't in this for the long haul. CenterPoint, at least in part, is owned by CalPERS. That's the California government pension plan. If it was your pension plan, would you feel more comfortable having the borrower, an entity, I think it's called Stanford Management, which isn't even licensed to do business in Illinois and which on its website looks like it's a senior citizen housing management company located in Maine? Would you be more comfortable with Stanford Management or would you be more comfortable with Colliers, Bennett, and Conwiler, making sure that the building doesn't fall down, that the water getting in from the roof doesn't reach such an extent that the walls collapse? I mean, that to me is, you know, that's the harm. And it really comes down, and it's really a question of trust. There's been – they keep talking about this development. What does that mean? What are they talking about? Are they talking – what are they talking about? They're talking about knocking down the building and building a hotel. How are they going to get construction financing to do that? How are they going to get the funds to do that? And how long is that going to take? Meanwhile, you have a loan in default. Is the lender just supposed to sit there and wait with a $37 million loan in default while they take years to develop the property? I mean, you can throw around this word development, but, you know, what does that really mean? This case is no different than any of the other cases in a sense, just because this is not an apartment building. The main argument seems to be that because there's a receiver, it affects their right to refinance the property, that they can't refinance it because there's a receiver. It's not enough that there's a foreclosure, but the action in place, but no one's going to touch this property because there's a receiver and they're not in control. Well, if that was the standard, a receiver would never be appointed in a commercial case. If a receiver affects the ability of the borrower to refinance the property, then you could never have a receiver if that was the standard. This case is no different in that respect. And this case is really no different than any other project that's in trouble where, you know, yes, it's an apartment building, but its real value lies in it being changed into condominiums or its real value lies into it being rehabbed in some way in the future, and a receiver isn't going to do that. You could make the same argument in any case. You'd never have a receiver be appointed, and it's significant to note that in the dozen or so cases in Illinois and in the Northern District of Illinois, there isn't a single case in which the appointment of a receiver hasn't been upheld in a commercial decision. I mean, you have to stop and think and look at that, and as Your Honor pointed out, that's because it's the law in the state of Illinois that the lender is entitled to a receiver, that the lender is entitled to have an independent party under the supervision of the court make sure that the insurance is paid, that the taxes are paid, that the building is secure, that whatever, if there are environmental problems or other problems, that these are going to be addressed, and a lender shouldn't have to trust a borrower who's already defaulted on a significant loan to make sure that those things have happened. Unless you have any questions, I don't know what else I can say, Judge. Thank you, sir. Thank you. Counsel, reply? Mr. Holman? A couple of brief comments. Mr. Verlick tries to convince the court that this is just like all the other cases, whether they be the state cases, the federal cases, the ones that we have both cited in our brief. They refuse to accept the notion that this case is completely different in the respect that this is a vacant piece of property. And all of the arguments made by Mr. Ehrlich would make sense if we were talking about the Willis Tower or a big apartment building where things needed to be managed in those properties. That is not the case here. That makes this case far different from any of the other cases that have been cited. And the reason there haven't been any other cases cited is because there aren't any. And Mr. Ehrlich's right. No other case has thrown out the receiver or has sustained an objection. Well, maybe it's time to look at a different situation and say there are certain circumstances where good cause makes some sense. Excuse me, counsel, but why does the fact that this is, as you say, more of a vacant piece of property and not, if you're correct, the situation of having a working building up that needs to have rents taken, but still, where do we get to the point that good cause is shown requiring that you are allowing your side to have the building? Using the suggestions that have come through some of the other cases and some that we have brought up ourselves, I guess, a balancing test of the harms. We think that there's more harm to be done by having a receiver in place than not. And what is the harm? The harm is the hindrance there is to development plans, development plans that involve the city of Chicago, the development plans that have been maintained and handled by my client with the involvement of zoning, of TIF money. Now, all that's, it's halted. I mean, we can talk to people, as I said before, and I don't want to repeat, but there is potential harm there, whereas there's no real harm to CenterPoint. You can talk about, oh, the insurance wasn't paid or a bill wasn't paid. Now, that makes some sense, again, in a working building. It doesn't make any real sense here because their $37 million is protected by the land, not by a parking garage or a vacant building or an empty lot. Their $37 million, and they knew it when they took the loan, and Mr. Ehrlich said they're not in it for the long haul, but we know, in fact, that they want to be in it for the long haul. The discovery that we've had to date has shown that they've analyzed this whole project and they assess their best-case scenario in this property is that if we default, then they get the property and they get the development. Now, should we consider, as Mr. Ehrlich has suggested, the progress in the foreclosure action, that you've lost your second amended complaint to preclude foreclosure and it's likely to be sold? Well, I take issue with that because the order says that we have until February 22nd to file an amended counterclaim, and so, and Mr. Ehrlich said that how long will this go on? Well, that's really an irrelevant consideration because the trial court is going to manage the progress of the foreclosure case with or without a receiver. There will be an end to that, whether the receiver is in or not, and the presence or absence of a receiver is not going to dictate the progress of that case. But isn't that something that courts should consider? So let's take your attitude, I'm sorry, your position in the trial court, which would be, I don't want to say it's delayed, but you're going to protect your client's rights as much as you can by filing as many counterclaims as you can until you lose those. And so, let's say it goes on for another year, year and a half, doesn't that cut against your position that how long should the bank have to wait? Should they wait for a year and a half? At this point, it will be two and a half years overdue without it dying. I would suggest to you that I think cuts against your position. Taking the other side, that you don't choose not to file a third amended complaint or a second amended counterclaim. Now it goes through and it's put up for sale, how long will it take? Four months. It will be sold in four months. How will you be helped by, should we consider the fact that it will be sold in four months? Would that cut against you, your position, since you'd only have it back for four months before it was sold? Well, if you had to consider that we only had four months, I would say that's still four months that we wouldn't otherwise have. But I think it's unrealistic to say that this property is going to be sold in four months because the court allowed us time to file an amended complaint. We intend to file an amended complaint. That's end of February. No doubt CenterPoint will move to dismiss that. That's the end of March. We'll respond. Now we're at the end of April. They'll reply. We're into May. There's not going to be a ruling on that until June or July. In the meantime, the court can't hold a sale. So we're talking mid to late 2010 before the property realistically could be sold, which gives us all that time to continue on with the development plans and as best that we can in an unimpeded fashion. So I think the lesson of this case is that it is a far cry from any other receiver case that this court or any of the federal courts have looked at in terms of what is good cause in two principal respects, or three. One is the condition of the land being vacant. Two is we actually have some proof to support why it's beneficial to have the mortgagor in possession. And three, notwithstanding Mr. Ehrlich's argument, there is the potential of harm to CenterPoint, or benefit I guess, harm or benefit, whichever way you want to look at it, if the development plans go forward, there's a better likelihood that we'll get the money to pay them soon. Thank you for the arguments and the fine briefs. I'm sorry. One question. The Olympics, what impact does that have on your plan? For example, you said you went to the city and there was a development plan for hotels and all of this in that area. And I think needless to say, all of us know that if the Olympics had come near that area, it would be red hot. That would probably be the most valuable land in the city perhaps. Right. Now that we are getting the Olympics, what is the likelihood of your plan for hotels and all of that actually go through? I'm not a real estate developer, but I think there's an argument that it's better, in that now we don't have to build buildings for the Olympics for the athletes. We can now focus on true development for the McCormick Place. And maybe a bigger problem is what's happening at McCormick Place with the conventions leaving town, which I presume will get fixed in some way, shape, or form. So I don't really know the answer, but I think that there's no real answer at this point in time. But the developers would say the Olympics was a selling point, yes. The fact that the Olympics are not coming doesn't mean this development doesn't have potential. In fact, maybe it's even better without the Olympics. Perhaps you should go into real estate. Thank you so much for the arguments in the brief, John.